1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                      **EASTERN DISTRICT OF CALIFORNIA**

10

11  | ROBBIN DEE ROWE,                                  ) Case No.: 1:16-cv-00355 - JLT
12  |                         Plaintiff,                ) ORDER DIRECTING ENTRY OF JUDGMENT IN
                                                        ) FAVOR OF DEFENDANT NANCY A.
13  |             v.                                    ) BERRYHILL, ACTING COMMISSIONER OF
                                                        ) SOCIAL SECURITY, AND AGAINST PLAINTIFF
14  | NANCY A. BERRYHILL[1],                            ) ROBBIN DEE ROWE
    | Acting Commissioner of Social Security,           )
15  |                                                   )
    |                         Defendant.                )
16  |                                                   )

17      Robbin Dee Rowe asserts he is entitled to a period of disability and disability insurance benefits

18  under Title II of the Social Security Act. Plaintiff seeks judicial review of the decision denying his

19  application for benefits, asserting the administrative law judge erred in evaluating the medical record.

20  Because the ALJ applied the proper legal standards and the decision is supported by substantial

21  evidence in the record, the administrative decision is **AFFIRMED**.

22                                  **BACKGROUND**

23      On April 11, 2012, Plaintiff filed an application for benefits, in which he alleged disability

24  beginning May 1, 2004. (Doc. 12-13 at 68, 163) Plaintiff reported he was disabled due to a brain

25  injury, memory problems, pain, binocular-vision problems, heart problems, a broken neck, and high

26

27  ---

28  [1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Court substitutes Nancy A. Berryhill for her predecessor, Carolyn W. Colvin, as the defendant.

1

blood pressure. (*Id.* at 68)  The Social Security Administration denied his application at the initial level and upon reconsideration. (*Id.* at 96-99, 101-03)

Plaintiff requested a hearing and testified before an ALJ on Marcy 7, 2014. (Doc. 12-13 at 38) The ALJ determined Plaintiff failed to establish that he was disabled under the Social Security Act though his date last insured, and issued an order denying benefits on June 26, 2014. (*Id.* at 24-31) Plaintiff filed a request for review of the decision with the Appeals Council, which denied the request on January 9, 2016. (*Id.* at 5-7)  Therefore, the ALJ's determination became the final decision of the Commissioner of Social Security.

## STANDARD OF REVIEW

District courts have a limited scope of judicial review for disability claims after a decision by the Commissioner to deny benefits under the Social Security Act. When reviewing findings of fact, such as whether a claimant was disabled, the Court must determine whether the Commissioner's decision is supported by substantial evidence or is based on legal error. 42 U.S.C. § 405(g).  The Court must uphold the ALJ's determination that the claimant is not disabled if the proper legal standards were applied and the findings are supported by substantial evidence. *See Sanchez v. Sec'y of Health & Human Serv.*, 812 F.2d 509, 510 (9th Cir. 1987).

Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The record as a whole must be considered, because "[t]he court must consider both evidence that supports and evidence that detracts from the ALJ's conclusion." *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

## DISABILITY BENEFITS

To qualify for benefits under the Social Security Act, Plaintiff must establish he is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area

in which he lives, or whether a specific job vacancy exists for him, or whether he
would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B). The burden of proof is on a claimant to establish disability. *Terry v. Sullivan*, 903 F.2d 1273, 1275 (9th Cir. 1990). If a claimant establishes a prima facie case of disability, the burden shifts to the Commissioner to prove the claimant is able to engage in other substantial gainful employment. *Maounois v. Heckler*, 738 F.2d 1032, 1034 (9th Cir. 1984).

## **ADMINISTRATIVE DETERMINATION**

To achieve uniform decisions, the Commissioner established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1520, 416.920(a)-(f). The process requires the ALJ to determine whether Plaintiff (1) engaged in substantial gainful activity during the period of alleged disability, (2) had medically determinable severe impairments (3) that met or equaled one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1; and whether Plaintiff (4) had the residual functional capacity ("RFC") to perform to past relevant work or (5) the ability to perform other work existing in significant numbers at the state and national level. *Id.* The ALJ must consider testimonial and objective medical evidence. 20 C.F.R. §§ 404.1527, 416.927.

### **A.** **Medical Evidence**

Plaintiff visited Dr. Shaw Yorizane, Jr., a Developmental Optometrist, for an evaluation on February 22, 2002. (Doc. 12-13 at 581) The following month, Dr. Yorizane wrote a letter to Plaintiff's employer, State Compensation Insurance Fund, regarding Plaintiff's visual limitations. (*Id.* at 567) Dr. Yorizane, opined that Plaintiff had "[v]isually related disabilities," including color blindness, convergence insufficiency, hyperphoria, visual suppression, and decreased visual acuity. (*Id.* at 567-87) Dr. Yorizane explained the convergence insufficiency made it "difficult for Mr. Rowe to sustain near point work without sustaining undue eye strain," and hyperphoria meant Plaintiff's "eyes do not always alight properly and together in the vertical direction." (*Id.* at 586) Dr. Yorizane believed the conditions could "be helped through the use of orthopic vision therapy." (*Id.* at 586-87) Likewise, Plaintiff's visual suppression, where his "brain subconsciously shut[] off information intermittently," could "be helped though pleoptic vision therapy." (*Id.* at 587) Although Dr. Yorizane "recommended further advanced visual processing tests," Plaintiff "did not return for his additional

3

testing." (*Id.* at 581) After the examination in February 2002, Dr. Yorziane did not see Plaintiff "for any reason other than to review [the] 2002 findings with him and his wife on April 16, 2014." (*Id.*)

Dr. Trilock Puniani performed a neurological evaluation on March 16, 2002. (Doc. 12-13 at 517) Plaintiff reported that in February 1996, he was in a skiing accident where another person "ran over him," causing him to "hit his head and neck and back." (*Id.*) Plaintiff said he was rendered unconscious, and had no recollection of the accident. (*Id.*) Dr. Puniani noted that a CT scan from February 16, 1996 was "normal" and "revealed no evidence of intracranial bleed or subdural hematoma." (*Id.* at 517-18) Plaintiff said he was currently employed as a claims adjustor and believed he "was doing fairly well," but his supervisor gave him a "discouraging" evaluation, indicating that Plaintiff was not "perform[ing] his job adequately and on time." (*Id.* at 517) In addition, Plaintiff said he "occasionally … had some problems with his memory and remembering things." (*Id.*) Plaintiff reported he went to an optometrist, "who found that he had some eye muscle damage, which was due to an alleged head injury." (*Id.*)

Dr. Puniani noted that Plaintiff's "speech [was] somewhat slow." (Doc. 12-13 at 517) He found Plaintiff's comprehension was intact, and he was "alert and oriented to person, place, and time." (*Id.* at 517) Dr. Puniani indicated that Plaintiff's "mini mental status examination revealed a score of 30/30." (*Id.*) Dr. Puniani also observed that Plaintiff's coordination was "symmetrical" and he had normal strength in his arms and legs. (*Id.* at 518) Further, Plaintiff had a normal gait was "able to walk on toes, heels, and tandem." (*Id.*) Dr. Puniani concluded that Plaintiff had "perhaps minimal resultant cognitive deficits which were more noticeable from his job performance and mild extraocular muscle involvement as detected by the optometrist." (*Id.*)

Plaintiff had a CT scan of his cervical spine taken on March 16, 2002 upon the request of Dr. Puniani. (Doc. 12-13 at 576) Dr. Eugene Gilpin found "marked degenerative changes at C5-6, C6-7 and C7-T1, manifested by disc space narrowing, eburnation and spurring." (*Id.*) Dr. Gilpin also found "an old minimal compression fracture of C6" and "a reversal of the normal cervical lordosis, primarily involving [the] named vertebral bodies." (*Id.*) Dr. Gilpin concluded Plaintiff's "[m]arked degenerative changes" were "probably posttraumatic." (*Id.*0

On March 27, 2002, Plaintiff visited Dr. Benjamin Chang, reporting he had "chronic neck and

4

back pain." (Doc. 12-13 at 468) He told Dr. Chang the pain developed after his skiing accident and "got[] worse gradually." (*Id.*) Plaintiff described his pain as "constant aching and dull" and said it was "exacerbated by any kind of neck movement in all directions especially with the flexion and extension." (*Id.*) Plaintiff said he "had one session of physical therapy but quit." (*Id.*) Dr. Chang observed that Plaintiff did not appear "in acute distress" and had "[n]o trouble getting in and out of the examining table." (*Id.* at 469) He noted Plaintiff exhibited "[m]ild tenderness over the posterior paraspinal muscle," but no muscle spasms, deformities, or edema. (*Id.*) Further, Dr. Chang found Plaintiff had a limited range of motion with the neck flexion and extension. (*Id.*) Dr. Chang prescribed Demerol IM and directed Plaintiff to perform gentle range of motion stretching and strengthening exercises. (*Id.*)

Plaintiff requested "a progress note for his employer" from Dr. Chang on April 24, 2002. (Doc. 12-13 at 470) The same date, Dr. Chang also indicated he ordered physical therapy for Plaintiff. (*Id.*)

On April 30, 2002, the State Compensation Insurance Fund granted Plaintiff's "request for a leave of absence of 30 days," commencing May 1, 2002. (Doc. 12-13 at 510) Plaintiff provided documents to his employer that "indicated … a projected 40% improvement in [his] performance [was] expected with the suggested therapy and rehabilitation." (*Id.*)

Plaintiff had an MRI taken of his cervical spine on May 15, 2002. (Doc. 12-13 at 577) According to Dr. Gary Vann, the MRI showed "reversal of the normal lordotic curvature of the cervical spine." (*Id.*) Dr. Vann concluded Plaintiff had "[o]ld posttraumatic and degenerative arthritic changes" in the cervical spine. (*Id.*) He found "[n]o spinal canal stenosis or nerve root impingement." (*Id.*)

On May 30, 2002, Plaintiff told Dr. Chang he continued to have back and neck pain. (Doc. 12-13 at 467) Upon examination, Dr. Chang opined that Plaintiff had exhibited "limited back and neck pain with mild tenderness." (*Id.*) Plaintiff requested an epidural injection, which Dr. Chang ordered. (*Id.*) The same day, Dr. Chang completed a "visit verification" regarding Plaintiff's leave, and indicated Plaintiff had been diagnosed with "chronic neck and back pain" and "old C6 compression deformity." (*Id.* at 516) Dr. Chang indicated Plaintiff could return to work, without any restrictions, on May 31, 2002. (*Id.*)

In July 2002, Plaintiff was employed as a sales representative. (Doc. 12-13 at 520) On July 5,

Plaintiff visited Dr. Berj Kalamkarian, who conducted an evaluation to determine whether an epidural steroid injection should be administered. (Doc. 12-13 at 520) Plaintiff told Dr. Kalamkarian that he was currently employed as a sales representative. (*Id.*) Plaintiff reported the skiing accident as well as another, later accident caused "significant pain and discomfort [and] limitation of activities." (*Id.*) Plaintiff told Dr. Kalamkarian he was "currently taking Naprosyn, Tramadol, and oxycodone." (*Id.*) Dr. Kalamkarian observed that Plaintiff's "[r]ange of motion in the lumbar spine [was] within normal limits with increased pain on extension," and Plaintiff's "[s]traight leg raising [was] "symptomatic at 75 degrees on the left and 80 degrees on the right." (*Id.*) Dr. Kalamkaria noted an MRI "indicate[d] an L5-SI disc space degeneration," "desiccation of the L3-4 disc space, [and] flattening of the anterior aspect of the thecal sac eccentrically towards the right with some mild dorsal displacement of the right L4 nerve root." (*Id.*) Dr. Kalamkarian concluded Plaintiff was a candidate for an epidural treatment. (*Id.* at 521)

Plaintiff received epidural injections in his lumbar spine on July 31 and September 11, 2002. (Doc. 12-13 at 524-31) Plaintiff received a third epidural injection in cervical spine on September 25, 2002. (*Id.* at 532-34)

In November 2002, Plaintiff was diagnosed with "chronic pain." (Doc. 12-13 at 558) When Plaintiff ran out of Oramorph and Oxycontin, he could not see Dr. Chang who was out of the office. (*Id.*) As a result, Plaintiff went to urgent care, where he declined an injection and received a prescription for Vicodin to hold him over until his treating physician could refill his prescriptions. (*Id.*)

In January 2003, Plaintiff was evaluated for and admitted to Kaiser Permanente's Chronic Pain Care Management Program. (Doc. 12-13 at 568) Plaintiff was diagnosed with chronic pain, which was attributed to cervical and lumbar degenerative disc disease and cervico-thoracic myofascial pain syndrome. (*Id.* at 548) Dr. Jonathan Wiens observed that "the intensity of medical care in the program and [Plaintiff's] medication [were] somewhat mismatched with his activity level," because Plaintiff "reported snowskiing twice weekly and walking 5 miles on some days." (*Id.*) On the mental status examination, Dr. Perez observed that Plaintiff's results were within normal limits except for an "articulation problem." (*Id.* at 544) Dr. Perez indicated there was a need to rule out an adjustment disorder. (*Id.*)

In March 2003, Plaintiff told Dr. Ganesh Prasad that he was working as a private investigator. (Doc. 12-13 at 560) He reported that he had pain in his neck and back—which he rated a "7 out of 10"—but "continued to remain active." (*Id.* at 560, 561) Plaintiff said he "still continue[d] to ski fairly frequently but…limited his skiing to less aggressive skiing," navigating "very gentle slopes." (*Id.* at 560) Dr. Prasad observed that Plaintiff exhibited "very minimal tenderness in the cervical spinal muscles, bilaterally;" and "minimal tenderness in the lumbar paraspinal muscles, bilaterally." (*Id.* at 561-62) Dr. Prasad determined Plaintiff had negative straight leg raising tests and "no motor or sensory deficits" in the upper or lower extremities. (*Id.*) Dr. Prasad "strongly advised [Plaintiff] to start some specific exercises for his lower back" and cautioned him about skiing. (*Id.* at 562)

Plaintiff saw Dr. Jill Russom in February 2004, seeking a refill of Oxycontin and Morphine. (Doc. 12-13 at 306) Plaintiff reported he was using the medication "every 2-3 days" but "needed to take more" with exercise. (*Id.*) Dr. Russom observed that Plaintiff's "neck appear[ed] stiff on rotation." (*Id.* at 307) At a follow-up appointment approximately two weeks later, Plaintiff told Dr. Russom that he sometimes had numbness and was careful moving his arm so he would "not have any new problems with his neck." (*Id.* at 304) Dr. Russom observed that Plaintiff was "very stiff in the neck and back region" and his posture was "upright with minimal range of motion of his neck." (*Id.*) She noted that Plaintiff had been referred to physical therapy for his neck and back but Plaintiff had "not followed up with this yet." (*Id.* at 305) Dr. Russom gave Plaintiff triplicate prescriptions for MS Contin and Oxycodone. (*Id.*)

In April 2004, Plaintiff told Dr. Russom that he had "good and bad days," but he felt "more stiff" and did not know why. (Doc. 12-13 at 302) Plaintiff said he "still [did] not have insurance because he [couldn't] seem to get the minimum number of hours (32/week) to qualify for insurance benefits." (*Id.*) Plaintiff told Dr. Russom that he "work[ed] more hours than the [got] credit for," but due to his financial status, he missed doses of his medication and was unable to pay for physical therapy. (*Id.*) Upon examination, Dr. Russom found Plaintiff had "a decreased range of motion in [his] neck and back." (*Id.* at 303) Dr. Russom opined Plaintiff's condition had "deteriorated" and diagnosed Plaintiff with "chronic neck and back pain." (*Id.*) She refilled Plaintiff's prescriptions for MS Contin and Oxycodone. (*Id.*)

On May 7, 2004, Plaintiff visited Dr. Gary Crister, DO, again reporting he had "constant pain" in the neck.[2] (Doc. 12-13 at 301) He told Dr. Crister that his "[m]edications [were] doing decently, but for sometimes during the day." (*Id.*) Dr. Crister found Plaintiff exhibited "nuchal rigidity," which was greater on the right side than the left. (*Id.*)

Plaintiff returned to Dr. Russom for "refills on his chronic pain medicines" in June 2004. (Doc. 12-13 at 299) Dr. Russum noted, "He states that his medications are working well for him at this time." (*Id.*) She observed that Plaintiff sat "with his back straight" and "his neck straight up with minimal range of motion." (*Id.*)

In July 2004, Plaintiff reported to Dr. Russom that work was "okay" and his medication was "working okay." (Doc. 12-13 at 311) He told Dr. Russom that it was "hard for him to determine what he needs to do to keep the pain under control" and he felt he needed "6 OxyIR daily." (*Id.*) Dr. Russom determined Plaintiff's "range of motion of the neck [was] decreased in all ranges" and noted his head was "flexed forward." (*Id.* at 312) Further, upon the mental status examination, Dr. Russom determined Plaintiff's memory was "intact for recent and remote events." (*Id.*) Plaintiff did not exhibit any "depression, anxiety, or agitation." (*Id.*)

In August 2004, Plaintiff reported he was "doing well… and his pain has controlled well" with the MS Contin and Oxycodone. (Doc. 12-13 at 295) He said he took Morphine "every 12 hours" and "two or four [Oxycodone] daily," though he said reported that "sometimes he does not take any." (*Id.*)

On October 8, 2004, Plaintiff saw Dr. Constantine Phiripes, requesting refills for his medication for "chronic neck and back pain" for an "on the job injury." (Doc. 12-13 at 294) Plaintiff said he "had an exacerbation of pain recently due to sitting in front of the computer monitor." (*Id.*) Plaintiff also stated his pain was "well controlled" with the medication, which was refilled by Dr. Phiripes. (*Id.*) Plaintiff returned to Dr. Phiripes in November and December 2004 for refills. (*Id.* at 292-93)

Throughout 2005, Plaintiff continued to see either Dr. Russom or Dr. Phriripes for prescription refills. In March, Plaintiff reported he was "doing well with the current regimen." (Doc. 12-13 at 288) Likewise, in July, Plaintiff told Dr. Russom his regimen was "working fine for him," though he was

---

[2] This is the first visit Plaintiff made to a physician after the alleged onset disability onset date of May 1, 2004.

8

"needing to use more… because he [was] doing more yard work – stooping, carrying heavy things, etc." (*Id.* at 286) In September 2005, Dr. Russom noted Plaintiff was getting "150 tablets of the Oxy IR… per month." (*Id.* at 284) Because Plaintiff was "stable on the medication," Dr. Russom indicated Plaintiff could visit the office every two months and call every other month for his prescription refills. (*Id.* at 285)

In May 2006, Plaintiff was seen by Dr. Sharnjit Purewal, who noted Plaintiff said he "continue[d] to have the same pain in his neck." (Doc. 12-13 at 275) Plaintiff said the medication was "mainly for his low back," and he had to take more "if he [was] more active during the day such as walking more." (*Id.*) Dr. Purewal found Plaintiff did not have any tenderness in his cervical spine and his "range of motion [was] nearly normal." (*Id.* at 276) In addition, Dr. Purewal found Plaintiff had "very minimal tenderness in the SI joint areas bilaterally, but no lumbar area tenderness." (*Id.*) Further, Plaintiff was able to raise his legs "to 90 degrees bilaterally without pain," and his strength was "5/5 in both lower extremities." (*Id.*) Dr. Purewal identified "low back exercises to [be done] on a daily basis" and "encouraged [Plaintiff] to walk more regularly." (*Id.*)

Although Dr. Purewal refilled Plaintiff's prescriptions for Morphine and Oxycodone, Plaintiff had difficulties getting the prescription filled since Dr. Purewall was not affiliated with the University Medical Center. (Doc. 12-13 at 272, 275) Plaintiff returned four days later to Dr. Russom, who noted Plaintiff's "pain [was] not controlled" since he had been unable to fill the prescription. (*Id.* at 273) She observed that Plaintiff had a "decreased neck range of motion." (*Id.*) With the mental status exam, Dr. Russom opined Plaintiff's judgment, insight, and memory were "intact;" and he did not exhibit depression, anxiety, or agitation. (*Id.*) Dr. Russom continued to refill Plaintiff's prescriptions for Morphine and Oxycodone to treat the chronic pain through 2008. (*See* Doc. 12-13 at 346-68)

In 2012 and 2013, Drs. Ocrant, Ikawa, Nasrabadi, and Haroun reviewed the medical evidence related to Plaintiff's reported physical and mental impairments. (Doc. 12-13 at 72-73) Drs. Ocrant and Nasrabadi determined the evidence was insufficient to evaluate Plaintiff's physical residual functional capacity though the date last insured. (*Id.* at 72, 86) Likewise, Drs. Ikwawa and Haroun found "insufficient evidence to substantiate the presence of a [mental] disorder" through Plaintiff's date last insured. (*Id.* at 73, 87)

**B.    Administrative Hearing Testimony**[3]

Plaintiff testified before the ALJ on March 7, 2014. (Doc. 12-3 at 35) He reported that he had "a bachelor's degree in sociology and a Master's degree in international business." (*Id.* at 39) He reported that from 2004 to 2007, he worked for a company called Global Compliance, where his job duties included ordering inventory, performing exist interviews, and collecting company property. (*Id.* at 40-41) Plaintiff said he "probably worked 20 hours a week" and was paid based upon the task completed rather than by the hour. (*Id.* at 41) In addition, Plaintiff reported that he worked from 2008 to 2012 as an investigator, paid to "wear a hidden camera" while touring homes and apartments to record his interactions with employees of Impact Marketing and Holland Clarkson Sparks. (*Id.* at 41-42) He acknowledged that he did not report the income from any of these positions to the government. (*Id.* at 42)

When asked what limited his ability to work between May 2004 and September 2009, since he "actually [was] working," Plaintiff responded that he considered himself "underemployed" during that period. (Doc. 12-3 at 46) He stated that the most he worked at one time was "maybe four hours." (*Id.* at 59) Plaintiff believed he could have done more work if it had been offered to him, though he was not sure he could work 40 hours per week. (*Id.* at 53, 54)

He stated that he was limited by having his neck fractured during the accident in 1998 and a "brain injury that… wasn't discovered until 2002." (Doc. 12-3 at 46) In addition, Plaintiff said he had been a professor at Fresno State but "could no longer lecture after the accident." (*Id.* at 53) Plaintiff explained he had a job with State Comp in 2002 that required him to use a computer, and he was having difficulty with his vision. (*Id.* at 46) He testified that he went to Dr. Yorizane, who Plaintiff said "discovered that [he] had a brain injury" and his "eyes were no longer functioning together." (*Id.*)

Plaintiff reported that he "didn't have medical insurance for most of [the relevant] time," so he did not receive "extensive tests." (Doc. 12-3 at 49) Plaintiff explained that he was able to get his medication because he "was on a patient assistance program and was getting it at no cost." (*Id.*) Plaintiff said that as of the hearing, he was taking methadone, which cost him $28 per month. (*Id.*)

---

[3] The ALJ found Plaintiff lacked credibility regarding the extent of his impairments (Doc. 12-3 at 27), and Plaintiff does not challenge the adverse credibility determination.

10

|   |   |
|---|---|
| 1 | He testified that he was an only child and helped to take care of his parents prior to their |
| 2 | deaths. (Doc. 12-3 at 52) Plaintiff said his mom was in a wheelchair, and his dad passed away at the |
| 3 | age of 93, so he helped around the house, such as by preparing meals and transporting his mother to |
| 4 | doctor appointments, "just about every day." (*Id.*) |
| 5 | **C.     The ALJ's Findings** |
| 6 | The ALJ first determined that Plaintiff "last met the insured status requirements of the Social |
| 7 | Security Act on September 30, 2009." (Doc. 12-13 at 26) Next, the ALJ found Plaintiff "did not |
| 8 | engage in substantial activity during the period from his alleged onset date … through the date last |
| 9 | insured, September 30, 2009." (*Id.*) At step two, the ALJ found that "[t]hrough the date last insured, |
| 10 | the claimant had the following medically determinable impairment: chronic pain." (*Id.*) The ALJ |
| 11 | found this impairment was not severe because it did not "significantly[] limit the ability to perform |
| 12 | basic work-related activities for 12 consecutive months." (*Id.*) Therefore, the ALJ terminated the five- |
| 13 | step process, and concluded Plaintiff was "not under a disability, as defined in the Social Security Act, |
| 14 | at any time from May 1, 2004, the alleged onset date, through September 30, 2009, the date last |
| 15 | insured. (*Id.* at 31) |
| 16 | **DISCUSSION AND ANALYSIS** |
| 17 | Plaintiff contends the ALJ erred by terminating disability analysis at step two. (Doc. 15 at 6-9) |
| 18 | The inquiry at step two is a *de minimus* screening "to dispose of groundless claims." *Smolen v. Chater*, |
| 19 | 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yucket*, 482 U.S. 137, 153-54 (1987)). The |
| 20 | purpose is to identify claimants whose medical impairment makes it unlikely they would be disabled |
| 21 | even if age, education, and experience are considered. *Bowen*, 482 U.S. at 153 (1987). |
| 22 | A claimant must make a "threshold showing" (1) he has a medically determinable impairment |
| 23 | or combination of impairments and (2) the impairment or combination of impairments is severe. *Id.* at |
| 24 | 146-47; *see also* 20 C.F.R. §§ 404.1520(c), 416.920(c). Thus, the burden of proof is on the claimant to |
| 25 | establish a medically determinable severe impairment that significantly limits his physical or mental |
| 26 | ability to do basic work activities, or the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. |
| 27 | §§ 404.1521(a), 416.921(a). |
| 28 | /// |

**A.   Medically determinable impairment(s)**

Plaintiff contends the ALJ erred at step two of the analysis by finding that he did not have a medically determinable impairment. (Doc. 15 at 8) Plaintiff observes that the ALJ stated:

> Unless a claimant can point to a medically-determinable impairment that accounts for his or her pain, I cannot find that pain affects the claimant's ability to do basic work activities. In other words, without a medically-determinable impairment to account for it, pain, standing alone, is nonsevere.

(Doc. 12-13 at 27) Plaintiff argues this "finding was factually incorrect" because he "did, in fact, provide[] documentation of a medically-determinable impairment that accounts for his pain: a previously fractured neck and existing spinal injuries." (*Id.*, citing AR 571-72) Further, Plaintiff observes "he provided documentation of a number of treating physicians' diagnoses of lumbosacral radiculopathy and chronic neck pain associated with a closed fracture of his C6 vertebra." (*Id.*, citing AR 284-30, 307-08, 342-69, 523-37, 540-44, 564) Plaintiff concludes, "Having presented evidence of a medically-determinable impairment that accounts for his pain, the ALJ erred by non continuing and completing the disability analysis." (*Id.*)

Significantly, Plaintiff fails to recognize the ALJ found that during the relevant time period, Plaintiff "had the following medically determinable impairment: chronic pain." (Doc. 12-13 at 26) The portion of the ALJ's decision quoted above by Plaintiff is merely an explanation of the applicable standards. As noted by the ALJ, "[a]n individual's statement as to pain … shall not alone be conclusive evidence of disability." 42 U.S.C. § 423(d)(g)(a); *see also* 20 C.F.R. § 404.1529(a) (explaining an ALJ must consider a claimant's statements about pain, but subjective statements "will not alone establish [disability]"). Rather, there must be a medically determinable impairment to support the claimant's assertion of pain, and "chronic pain"—as recognized by the ALJ here— *is* a medically determinable impairment. *See, e.g.*, *Myers v. Colvin*, 954 F. Supp.2d 1163, 1172 (W. Wash. 2013) (rejecting the ALJ's conclusion that chronic pain was not a medically determinable impairment).

Moreover, the ALJ considered the etiology of Plaintiff's chronic pain by reviewing records pre-dating the relevant time period. (*See* Doc. 12-13 at 28) As noted by the ALJ, an x-ray in 2002 "suggested compression fracture at C7 with degenerative disc disease and degenerative joint disease." (*Id.*, citing Exh. 12F, pp. 2, 110 [Doc. 12-13 at 468, 576]) In addition, the ALJ observed the records

included MRIs taken of the lumbar spine in 2001 and the cervical spine in 2002, which showed "an old posttraumatic and degenerative arthritic change, with no spinal canal stenosis or nerve root impairment" in the lumbar spine and "mild to moderate spondylitic changes" in the cervical spine. (*Id.*, citing Exh. 12F, pp. 109, 111 [Doc. 12-13 at 575, 577]) Finally, the ALJ noted Plaintiff was diagnosed with "chronic mechanical low back pain, with multilevel degenerative disc disease of the lumbar spine, lumbar spondylosis and facet arthropathy, and possible discogenic pain." (*Id.* at 29, citing Exh. 12F, p. 96 [Doc. 12-13 at 562]) Thus, the record does not support Plaintiff's arguments that the ALJ failed to consider the above diagnoses at step two.

**B.     Severity of Plaintiff's impairments**

Importantly, the Ninth Circuit has determined that "[t]he mere existence of an impairment is insufficient proof of a disability." *Matthews v. Shalala*, 10 F.3d 678 (9th Cir. 1993). Accordingly, this Court explained: "A mere recitation of a medical diagnosis does not demonstrate how that condition impacts plaintiff's ability to engage in basic work activities. *Nottoli v. Astrue*, 2011 U.S. Dist. LEXIS 15850, at *8 (E.D. Cal. Feb. 16, 2011); *Huynh v. Astrue*, 2009 U.S. Dist. LEXIS 91015, at *6 (E.D. Cal. Sept. 30, 2009). Rather, for an impairment to be "severe," it must" significantly limit" the claimant's physical or mental ability to do basic work activities, or the "abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1520(c), 416.920(c), 416.921(b).

The ALJ reviewed the record and found Plaintiff failed to demonstrate his impairment "significantly limited his ability to perform basic work activities." (Doc. 12-13 at 27) As explained by the Regulations, examples of basic work activities include:

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. §§ 404.1522(b), 416.922(b). The ALJ found the medical evidence "support[ed] finding no

'severe' impairment prior to the date last insured." (Doc. 12-13 at 31)

1.  Mental abilities

As the ALJ observed, Plaintiff "allege[d] disability due to brain injury [and] memory problems." (Doc. 12-13 at 280) However, as the ALJ observed, Plaintiff's "admission that he was able to perform skilled work at light and sedentary levels indicates he had the mental capacity to work." (Doc. 12-13 at 31) Plaintiff does not identify any evidence undermining this conclusion.

Furthermore, the medical record supports the ALJ's conclusion. For example, in January 2003, Dr. Perez observed that Plaintiff's mental status examination results were within normal limits, except he appeared discouraged and had an "articulation problem." (*Id.* at 544) Likewise, Dr. Puniani found Plaintiff's comprehension was intact, and the "mini mental status examination revealed a score of 30/30." (*Id.* at 517) Further, Dr. Russom found in both July 2004 and May 2006 that Plaintiff's memory was "intact for recent and remote events." (*Id.* at 312, 273) She also opined Plaintiff did not exhibit any "depression, anxiety, or agitation." (*Id.*) Thus, there is substantial evidence in the medical record supporting the ALJ's conclusion that Plaintiff did not have a mental impairment that affected his abilities and aptitudes to complete basic work activities. *See* 20 C.F.R. §§ 404.1522(b), 416.922(b).

2.  Physical abilities

Plaintiff asserted his physical impairments included "pain binocular vision problems, heart problems, [a] broken neck, and high blood pressure." (Doc. 12-13 at 28) As noted by the ALJ, an x-ray from March 2002 suggested a history of "compression fracture at C7 with degenerative disc disease and degenerative joint disease," and Plaintiff was diagnosed with chronic neck pain. (*Id.* at 28) The ALJ observed also that in January 2003, Plaintiff was diagnosed with "chronic mechanical low back pain, with multilevel degenerative disc disease of the lumbar spine, lumbar spondylosis and facet arthropathy, and possible discogenic pain." (*Id.* at 29)

Despite these diagnoses and impairments, the ALJ also noted that Plaintiff "reported twice weekly skiing and walking up to five miles." (Doc. 12-13 at 29, citing Exh. 12F. pp. 20, 77 [Doc. 12-13 at 486, 543]) In addition, the ALJ observed that Plaintiff "was employed as an insurance adjuster from 2002 until 2004… and in 2002, reported earnings at the substantial gainful activity level." (*Id.*) After Plaintiff's employment was terminated in June 2002, he was able to find other work, though he worked

"less than 32 hours per week." (*Id.* at 29) Further, the ALJ noted Plaintiff testified he cared for his parents, "such as preparing meals, and taking his mother to doctor's appointments." (*Id.* at 30) Plaintiff's level of activity and ability to continue working support the ALJ's conclusion that Plaintiff's chronic pain and related diagnoses did not significantly limit his ability to perform basic work activities. *See Sadeeq v. Colvin,* 607 Fed.Appx. 629, 629 (9th Cir. 2015) (finding the ALJ did not err in concluding an impairment was not severe where the claimant "was able to continue working" despite his symptoms).

## **CONCLUSION AND ORDER**

Plaintiff has failed to demonstrate that he suffered a *severe* medically determinable impairment that significantly limited his ability to do basic work activities prior to his date last insured. Because the ALJ's step two findings are supported by substantial evidence in the record, the Court must uphold the conclusion that Plaintiff is not disabled. *See Sanchez*, 812 F.2d at 510. Based upon the foregoing, the Court **ORDERS**:

1. The decision of the Commissioner of Social Security is **AFFIRMED**; and
2. The Clerk of Court **IS DIRECTED** to enter judgment in favor of Defendant Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff Robbin Rowe.

IT IS SO ORDERED.

Dated: **August 15, 2017**       /s/ Jennifer L. Thurston
UNITED STATES MAGISTRATE JUDGE